UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROY H. PARKS III,

                Plaintiff,                        Civil Action No. 11-cv-11109

      v.                              District Judge Lawrence P. Zatkoff
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 18]**

      Plaintiff Roy H. Parks III brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 13, 18), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

**I. RECOMMENDATION**

      For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and conforms with the relevant legal standards. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

Plaintiff filed an application for disability on October 3, 2007, alleging that he became unable to work on March 1, 2005.[1]  (Tr. 87.)  The Commissioner initially denied Plaintiff's disability application on January 29, 2008.  (Tr. 101-105.)  Plaintiff then filed a request for a hearing, and on November 4, 2009, he appeared, with counsel, before Administrative Law Judge ("ALJ") Paul R. Armstrong, who considered the case *de novo*.  (Tr. 87.)  In a December 4, 2009 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 97.)  The ALJ's decision became the final decision of the Commissioner on January 12, 2011 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1-3.)  Plaintiff filed this suit on March 17, 2011.  (Dkt. 1, Compl. at 1.)

### B. Background

Plaintiff was thirty-three years old at the time of the ALJ's decision.   (Tr. 381.)  He was thirty on the alleged onset date. (Tr. 381.) He has a high school education and an Associates Degree in Film Production and Photography from film school. (Tr. 210.)  He also completed two years of college.  (*Id.*)  He worked as a self-employed photographer from 2005 through 2009.  (Tr. 206, 307-17.)

### *1. Plaintiff's Testimony at the Hearing Before the ALJ*

At the November 4, 2009 hearing before the ALJ, Plaintiff testified regarding his bipolar disorder, obsessive compulsive disorder ("OCD") and his personal and employment history.  (Tr. 29.)

---

[1] Plaintiff's date last insured is September 30, 2008 (Tr. 87.)  Therefore, Plaintiff must establish that he was under a disability prior to September 30, 2008. 20 C.F.R. § 404.131(a).

Regarding his bipolar disorder, Plaintiff explained that he has experienced paranoid delusions and auditory hallucinations. (Tr. 25-26.) He was easily irritated and would often "blow up at people." (Tr. 16.) Plaintiff said he had difficulty dealing with people and managing money. (Tr. 14.)

Regarding his OCD, Plaintiff testified that he has to "check and double check and triple check every square foot" of his condominium. (Tr. 29.) He compulsively moves things when he feels they are out of place. (*Id.*) He was not able to live with anybody because his condition "would drive people crazy." (Tr. 12.)

Regarding his personal and employment history, Plaintiff testified that he was incapable of supporting himself. (Tr. 20, 32.) He said that his OCD affected his ability to work efficiently. (Tr. 15.) He said he had a pattern of being fired from jobs because he did not get along with supervisors who told him how to work or complained that he was too slow. (Tr. 15-16.) Specifically, he held jobs for short periods of time at Office Max, Bob Evans, Home Depot, Wal-Mart, Kroger, and K-Mart, along with several other places. (Tr. 170-78.) He noted that while he had performed well in school, he was not able to translate that success into paying bills. (Tr. 30.) He discussed his failed photography business in which he lost money three years in a row. (Tr. 14.) He also reported that he had been sued by seventeen different clients in the span of two years. (*Id.*) He reported a history of relying on financial support from his family in order to pay rent. (Tr. 18-20.) He even noted that he had been evicted on one occasion. (Tr. 19.)

### 2. Plaintiff's Step-mother's Testimony at the Hearing Before the ALJ

Plaintiff's step-mother, Linda Lindstrom, also testified at the hearing. (Tr. 34.) She stated that Plaintiff "is not capable of making good decisions." (Tr. 35.) Through the ALJ's questioning

she confirmed that Plaintiff's bipolar disorder causes him to go through cycles where he gets manic and spends "too much money" and then gets depressed and does not "do anything." (*Id.*) She noted that Plaintiff cannot be told what to do. (*Id.*) She described one episode where she told him not to use a certain brush when scrubbing out water tanks because it might have had germs from the horses. (*Id.*) Instead of doing as he was told, he got mad and "storm[ed] off." (*Id.*)

She also described how Plaintiff went AWOL for three weeks after enlisting in the army in 1997 and, without permission, used his father's social security number to obtain credit cards. (Tr. 380, 34.) The situation became so bad that Plaintiff's father had to file charges against him. (*Id.*) Consequently, Plaintiff served time in prison. (*Id.*)

Ms. Lidstrom further testified that Plaintiff booked multiple weddings on the same day while operating his photography business causing him to lose several hundred dollars each time because he had to hire other photographers to do the job. (Tr. 42-43.) She also said that his clients sued him because he spent all the money they paid him and never had any left to buy the prints of the photographs he took, and thus, they never received the prints they ordered. (Tr. 45.) She maintained that this pattern of poor decision making was symptomatic of his condition. (*Id.*)

### 3. Medical Evidence[2]

#### a. Dr. Pamela Herringshaw & Dr. Campbell

In February 2003, Plaintiff began treatment at Oakland Psychological Clinic ("OPC"). (Tr. 376, 347.) He first met with psychologist Pamela Herringshaw on February 14, 2003. (*Id.*) Dr. Herringshaw noted in her intake report that Plaintiff had a "long history of mood problems and bi-

---

[2] Evidence after the date last insured is relevant only to the extent that it is probative of the claimant's condition prior to that date. *See Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1998); 20 C.F.R. § 404.131(a).

polar disorder." (Tr. 347.) She diagnosed him with bipolar disorder and obsessive compulsive disorder. (Tr. 351.) She also issued a global assessment of functioning ("GAF") score of 50.[3] (*Id.*) She created a treatment plan that called for therapy sessions and referred him to Dr. Campbell, a psychiatrist at OPC, for a psychiatric evaluation. (Tr. 352, 375.)

Dr. Campbell's assessment noted that Plaintiff had been diagnosed as bipolar and obsessive compulsive by a doctor in Florida after an outburst at film school. (Tr. 372.) Dr. Campbell also noted that Plaintiff had been prescribed Depakote and Luvox and that Plaintiff found the medication to be helpful. (*Id.*) In particular, Dr. Campbell noted that, since being medicated, Plaintiff said that he "seldom loses his temper [and] copes [with] stress easier." (*Id.*) Furthermore, Dr. Campbell found that Plaintiff's thought process was logical, his thought content appropriate, and that he was "able to concentrate." (*Id.*) He diagnosed Plaintiff with "bipolar affective disorder [and] obsessive compulsive disorder (mild)." (Tr. 374.) He assigned Plaintiff a GAF score of 50. (*Id.*) Lastly, he concluded that Plaintiff's prognosis was "good–especially if he can separate himself from home." (*Id.*)

Plaintiff treated with Dr. Herringshaw and Dr. Campbell until December of 2003 when his health insurance lapsed. (Tr. 346, 354.) Plaintiff attended weekly or bi-weekly psychotherapy sessions with Dr. Herringshaw. (*See* Tr. 355-57, 361-66.) In a treatment plan review in May 2003,

---

[3] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM-IV* at 34.

she noted that Plaintiff's mood swings had stabilized, but he was still struggling "with delusions of grandeur related to his career." (Tr. 366-67.) In her next treatment plan review, in August 2003, Dr. Herringshaw noted that Plaintiff "has not been taking responsibility for getting a job and making money to take care of his bills." (Tr. 358-59.) She concluded, "He seems to have difficulty seeing what he needs to do and has a sense of entitlement that others should take care of him." (*Id.*) At his next treatment session in August, Dr. Herringshaw commented that Plaintiff "is working on getting a job, but has some unrealistic expectations for job goals." (Tr. 357.) At his treatment session on September 6, 2003, Dr. Herringshaw noted that Plaintiff was pleased because he had obtained a job at Office Max, but still complained of "mood changes and how they affect his mood." (Tr. 356.) At his final psychotherapy session with Dr. Herringshaw, she noted that Plaintiff was "in denial about [the] situation" involving his lapse in insurance coverage. (Tr. 355.) Ultimately, however, Dr. Herringshaw concluded that Plaintiff's mood swings and career goals were both "improved." (Tr. 346.)

Plaintiff met with Dr. Campbell on four separate occasions after his initial mental status examination. In March 2003, Dr. Campbell noted that Plaintiff "seems calm, relaxed [with] no sign of mania." (Tr.370.) Ultimately, concluding that Plaintiff was "improved," Dr. Campbell renewed the prescriptions for Depakote and Luvox. (*Id.*) In April 2003, Dr. Campbell renewed the prescriptions again and concluded that Plaintiff's progress was "satisfactory." (Tr. 368.) In August 2003, Dr. Campbell noted that Plaintiff was "calm, euthymic, [and] patient." (Tr. 360.) He concluded that Plaintiff's progress was "altogether satisfactory." (*Id.*) In December 2003, Dr.

6

Campbell concluded that Plaintiff was "stable."  (Tr. 354.)[4]

### b. Dr. Nancy Koenig-Forbis

On January 18, 2008, Dr. Nancy Koenig-Forbis conducted a mental status exam of Plaintiff. (Tr. 377-84.) She noted that (i) he has "contact with reality," (ii) his "self-esteem goes up and down with mood," (iii) "he tends to wiggle and fidget," (iv) he is "polite and pleasant . . . talkative . . . [and] dependant," and (v) he has "no tendency to exaggerate symptoms." (Tr. 381.)  She also noted that he "exhibits feelings of insecurity with difficulties in eye contact."  (*Id.*)  During the mental status testing, Plaintiff lost concentration several times.  (Tr. 382-83.)  In particular, Plaintiff had difficulty repeating numbers forward and backwards, could only recall two of three named objects without a prompt  after three minutes had elapsed, and he lost concentration approximately midway through a "Serial 7's" Test.  (Tr. 383.)[5] Ultimately, Dr. Koenig-Forbis confirmed Plaintiff's history of mood swings and his past diagnosis of bipolar and obsessive compulsive disorder. (Tr. 383.)  She also diagnosed Plaintiff with attention deficit hyperactivity disorder, predominantly inattentive type, and with personality disorder with perfectionist features.  (*Id.*)  She issued a GAF score of 45, concluding, "Guarded. Professional counseling needed.  It appears that the mood disorder and obsession and compulsions are directly affecting [Plaintiff's] ability to productively manage gainful employment and relationships within that employment."  (*Id.*)

---

[4] Due to his lack of insurance, Plaintiff was referred to a community mental health organization in October of 2003.  No treatment  records, however,  exist for the period from December 2003 through January 2008.  (Tr. 93.)

[5] A "Serial 7's" Test involves subtracting the number 7 from 100, etc. until reaching zero. It is a test of concentration and attention.  *Teel v. Comm'r of Soc. Sec.*, No. 10-13154, 2011 WL 4484864, at *5 (E.D. Mich. Sept. 26, 2011).

### c. Dr. Rom Kriauciunas

On January 28, 2008, based on his examination of Plaintiff's medical records, Dr. Rom Kriauciunas completed a mental residual functional capacity ("RFC") assessment and Psychiatric Review Technique Form ("PRTF") for the State Disability Determination Services ("DDS"). (Tr. 386-405.) Dr. Kriauciunas's RFC concluded that Plaintiff "is able to do simple, low-stress, unskilled work on a sustained basis." (Tr. 390.) Specifically, he found:

> [Plaintiff] is moderately limited in [his] ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods. Also, [he] is moderately limited in ability to interact appropriately with the general public, to maintain socially appropriate behavior/to adhere to basic standards of neatness as well as cleanliness and to respond appropriately to changes at work.

(*Id.*)

In the PRTF, Dr. Kriauciunas also found that Plaintiff had the medically determinable impairments of ADHD, bipolar disorder, anxiety disorder related to recurrent obsessions or compulsions and personalty disorder. (Tr. 393, 395, 397, 399.) In evaluating the "B" criteria associated with the listings, *see* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926), Dr. Kriauciunas concluded that Plaintiff had only "mild" limitations in activities of daily living, but "moderate" limitations in maintaining social functioning and concentration, persistence or pace. (Tr. 402.) Lastly, he concluded that the medical evidence did not establish the presence of the "C" criteria associated with the listings. (Tr. 403.)

### d. Ms. Gail Craven & Dr. Michael Gottlieb

On March 20, 2008, Plaintiff resumed treatment at Insight Recovery Center ("IRC') under the care of licensed psychologist Gail Craven and psychiatrist Dr. Michael Gottlieb. (Tr. 414, 428.)

Ms. Craven conducted a mental status examination ("MSE") on Plaintiff's date of intake at IRC. (Tr. 416.) Ms. Craven noted that Plaintiff's intellect was "above average" and his speech, memory, interview behavior, orientation, and thought processes were all "normal"; however, she concluded:

> [Plaintiff] was disheveled (slightly) and he exhibited overactivity. He appeared anxious and expressed assaultive ideas, suspicious ideas, phobias, compulsions, obsessions, feelings of persecution and has experienced auditory hallucinations. He lacks personal and social judgment and his self-esteem is low. The [Plaintiff] denies thoughts of suicide currently.

(*Id.*) Ultimately, she diagnosed him with bipolar and obsessive compulsive disorder. (Tr. 418.) She also issued a GAF score of 49. (*Id.*)

In April 2008, Dr. Michael Gottlieb evaluated Plaintiff. (Tr. 428-30.) While he concluded that Plaintiff's appearance, motor behavior, speech, cooperativeness and motivation for treatment were within normal limits, he made no notes regarding Plaintiff's memory or judgment. (Tr. 429.) And his note regarding Plaintiff's emotional functioning is illegible.[6] (*Id.*) Ultimately, Dr. Gottlieb diagnosed Plaintiff with bipolar and obsessive compulsive disorder. (Tr. 430.)

Plaintiff attended therapy sessions at least once a month with Ms. Craven from March 2008 through the date of the hearing before the ALJ.[7] (Tr. 435-36.) In June 2008, Ms. Craven reported that Plaintiff was "still working" on attending all of his treatment appointments, taking his medication and resolving issues contributing to low self-esteem. (Tr. 426.) She set an expected achievement date of September 2008 and concluded "client progressing." (*Id.*) In August 2008, Ms.

---

[6] The ALJ found that the note was legible and deemed that it said "unremarkable." (Tr. 93.)

[7] While records for each individual therapy session have not been provided, Ms. Craven completed Treatment Plan Review Forms approximately every three months and those six evaluations are part of the record. (Tr. 421-26.)

9

Craven reported that Plaintiff had not resolved "issues contributing to low self-esteem." (Tr. 425.) She concluded that "client [is] stable." (*Id.*) In December 2008, Plaintiff had still not achieved this self-esteem objective. (Tr. 424.) Ms. Craven also reported that Plaintiff complained that the medication Dr. Gottlieb prescribed had not been effective. (*Id.*) In March 2009, Ms. Craven noted that Plaintiff still had not resolved "issues contributing to low self-esteem"; but did note that he was "slightly improved in mood and sense of well-being." (Tr. 423.) In June 2009, Ms. Craven noted that Plaintiff "has improved punctuality and is handling finances more efficiently." (Tr. 422.) Yet, she also noted that he was "still resolving issues contributing to low self-esteem." (*Id.*) In September 2009, Plaintiff had still not achieved the goal of "resolving issues contributing to low self-esteem." (Tr. 421.) Ms. Craven, however, created a new objective for Plaintiff: "The client will allow his gas tank to go below ½-full and report feelings to therapist." (*Id.*) She also issued a GAF score of 54.[8] (*Id.*)

In January 2009, Ms. Craven and Dr. Gottlieb completed a Psychiatric/Psychological Examination Report for the State of Michigan Department of Human Services to help the State Department determine the extent of Plaintiff's disability. (Tr. 431.) The report indicated many of the same symptoms as Plaintiff's intake report at IRC. (*Id.*) Ms. Craven noted that Plaintiff "is capable of engaging in most activities of daily living such as personal hygiene, cleaning, cooking, shopping and maintaining a residence . . . . [but] has exhibited difficulty in the areas of finance and/or budgeting money appropriately." (Tr. 432.) The report also included a mental RFC assessment. (Tr. 433.) The RFC concluded that Plaintiff was markedly limited in (i) the ability to

---

[8] A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM–IV* at 34.

carry out simple, one or two-step instructions, (ii) the ability to carry out detailed instructions, (iii) the ability to maintain attention and concentration for extended periods, (iv) the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, (v) the ability to sustain an ordinary routine without supervision, (vi) the ability to work in coordination with or proximity to others without being distracted by them, (vii) the ability to make simple work-related decisions and (viii) the ability to complete a normal workday and worksheet without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Ms. Craven also issued a GAF score of 51. (Tr. 432.)

In November 2009, Ms. Craven sent Plaintiff's counsel a letter detailing Plaintiff's medical condition. (Tr. 435-36.) In her letter, Ms. Craven noted that Plaintiff's OCD "causes him significant difficulty in functioning." (Tr. 436.) She discussed the need for Plaintiff to engage in "obsessive cleaning and constant checking rituals." (*Id.*) For example, she mentioned his need for "rugs to be perfectly straight and centered," and that "hangers in the closet must be equally spaced." (*Id.*) She noted that these obsessions and compulsions "cause [him] marked distress, are time consuming . . . and can significantly interfere with occupational functioning and social activities or relationships. Ms. Craven concluded her letter by stating that Plaintiff "has chronic mental disorders that impact his ability to perform the duties necessary and/or to interact with others effectively to maintain full or part-time employment." (*Id.*)

### 4. Vocational Expert's Testimony

Vocational Expert ("VE") Annette Holder testified at the hearing. (Tr. 51.) The ALJ proceeded to ask the VE to assume a hypothetical individual with no physical/exertional limitations,

11

who is "limited to simple unskilled work . . . . can do no public contact . . . and no more than superficial contact with supervisors and co-employees." (Tr. 52.)

The VE testified that such a hypothetical individual could perform work at the medium physical exertion level, including auto porter, dishwasher, packer and cleaner, of which there are 3,000, 3,900, 1,500 and 4,800 in the southeastern Michigan regional labor market, respectively. (*Id.*)

Subsequently, the ALJ asked the VE to consider the same hypothetical individual but with the additional limitation that the "person could only do routine jobs where there aren't changes or there's very few changes in the work environment." (Tr. 55.)  The VE testified that the jobs of auto porter, dishwasher, packer and cleaner would probably all involve some changes in the work environment, but that cleaner would probably have "fewer changes." (*Id.*)  She further noted that jobs in a factory setting, "like a sorter," would "have the fewest changes." (*Id.*)  Next, the ALJ asked the VE to assume that the hypothetical individual "couldn't take any changes in the work environment." (*Id.*)  The VE provided that such a limitation would eliminate all the jobs she had previously described. (*Id.*)

The ALJ continued by asking the VE to consider a hypothetical individual who could deal with "some minor changes at least, but [who] can't deal with anybody at all," not even "superficially." (Tr. 56.)  The VE testified that such a hypothetical individual could find no work in the national economy. (*Id.*)

Following the ALJ's questioning, Plaintiff's counsel asked the VE to consider the following hypothetical individual:

> An individual of the age, education and work history, educational background of the claimant with the following limitations: He's markedly limited in his ability to carry out one, two step instructions, the ability to carry out detailed instructions, the ability to maintain

12

> attention and  concentration for an extended period, the ability to
> perform activities within a schedule, maintain regular attendance and
> be punctual with customary tolerances in the work place.

(Tr. 57-58.)  The VE testified that such a hypothetical "individual would be precluded from all competitive employment."  (Tr. 58.)

Subsequently, Plaintiff's counsel asked the VE to consider an individual who is "moderately limited in all of the areas" described above.  (*Id*.)  The VE concluded that "even a moderate limitation of the ability to complete simple one or two step tasks would preclude employment." (*Id.*) Nevertheless, when questioned by the ALJ, the VE noted that, while a moderately limited person who could not stay on task for fifteen minutes per hour would be precluded from employment, someone who could not stay on task for five minutes per hour would not be so precluded.  (Tr. 59.) Similarly, the VE testified that a person who is moderately impaired such that he cannot keep a schedule would be precluded from employment if the impairment caused him to miss two days or more out of a month, but would not be precluded if the impairment only caused him to miss one day. (*Id.*)

Plaintiff's counsel then asked the VE to consider a hypothetical individual

> [w]ith the age, education and work history and skills of claimant with
> the following inabilities: the inability to adapt, to respond
> appropriately to change in the work setting, and the inability to travel
> in unfamiliar places or use public transportation and the inability to
> set realistic goals or make plans independently of others.

(Tr. 59-60.)  The VE testified that if the individual could drive then he would not be precluded; but, if he "can't find [his] way to the job" then he would be precluded from competitive employment. (*Id.*)

Lastly, Plaintiff's counsel asked the VE to consider a hypothetical individual of Plaintiff's

13

age, educational background, work experience and skills who "could not accept instructions and respond appropriately to criticism from [a] supervisor." (Tr. 61.) The VE testified that such an individual "would not be able to sustain employment. (*Id.*) Yet, the VE confirmed her previous conclusion that if such an individual could deal "superficially" with supervisors that he would not be precluded from employment. (Tr. 62.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied

without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity after the alleged disability onset date of March 1, 2005 through his last date insured of September 30, 2008. (Tr. 87, 89.) He concluded that Plaintiff's work as a photographer, which occurred after the onset date, "did not rise to the level of substantial gainful activity." (*Id.*) At step two, the ALJ found that Plaintiff had the following severe impairments: bipolar disorder and obsessive compulsive disorder. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 90.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is restricted to simple, unskilled work not requiring public contact or more than superficial contact with supervisors and co-employees." (Tr. 91.) At step four, the ALJ found that Plaintiff had "no past relevant work." (Tr. 96.) At step five, the ALJ stated that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*) Therefore, the ALJ held that Plaintiff was not

15

disabled as defined by the Social Security Act.  (Tr. 97.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that The Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);  *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by The Courts" (internal quotation marks omitted)).

### F. Analysis

Although neither is well developed, Plaintiff raises two claims of error on appeal.  Plaintiff first maintains that the ALJ's residual functional capacity ("RFC") assessment is flawed because he did not take into account Plaintiff's "recurrent mood swing which were reported in the Mental Status Report of January 18, 2008, and the anger as well as the  depression associated with his underlying condition."  (Dkt. 13, Pl.'s Mot. Summ. J. at ECF Pg. ID 485.)  Plaintiff also apparently argues that the ALJ placed unwarranted reliance on the findings of Dr. Kriauciunas because Dr. Kriauciunas had "no contact with Plaintiff, . . . [he] merely reviewed existing records."  (*Id.*)

### 1. Substantial Evidence Supports the ALJ's Residual Functional Capacity Assessment

Plaintiff argues that the ALJ's RFC assessment is not based on substantial evidence because the ALJ did not fully credit Dr. Koenig-Forbis' January 2008 MSE. (Dkt. 13, Pl.'s Mot. Summ. J.

at ECF Pg. ID 485.) This Court disagrees. The record illustrates that the ALJ reviewed the medical evidence between March 1, 2005 and December 4, 2009 (the date of the hearing, which post-dated Plaintiff's date last insured by over a year).[9] (Tr. 87.) The ALJ concluded that Dr. Koenig-Forbis' "opinion as to [Plaintiff's] functioning is not adequately supported by the doctor's own clinical observations." (Tr. 94.) Specifically, the ALJ noted that Dr. Koenig-Forbis' GAF score of 45 was inconsistent with her findings that Plaintiff could complete activities of daily living and the mental capacity testing that "yielded normal results." (Tr. 94.)[10] These findings were reasonable and are supported by substantial evidence.

Plaintiff similarly argues that the ALJ should have given greater weight to Dr. Koenig-Forbis' January 2008 report because she was Plaintiff's "care provider." (Dkt. 13, Pl.'s Mot. Summ. J. at ECF Pg. ID 488.) The ALJ, however, was not obligated to give her opinion heightened deference because Dr. Koenig-Forbis was not a treating source.

The regulations define a treating source as "[one's] physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatments or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §

---

[9] To be eligible for benefits, Plaintiff must not only establish his disability on or before his alleged onset date, but he must show that he suffered this disability prior to the expiration of his insured status. 42 U.S.C. §§ 423 (a)(1)(A), 423 (c)(1); 20 C.F.R. § 404.130. The expiration of a Plaintiff's insured status is known as the date last insured ("DLI"). *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Plaintiff's DLI is September 30, 2008 (Tr. 89.) Thus, for Plaintiff's alleged marked limitations found in Ms. Craven's 2009 Report to the Department of Human Services to be relevant to the ALJ's RFC, Plaintiff must show evidence of such conditions between March 1, 2005 and September 30, 2008. Evidence of these conditions after September 30, 2008 is only relevant to the extent that it is probative to Plaintiff's conditions prior to that date. *Higgs*, 880 F.2d at 862.

[10] While the ALJ noted that Plaintiff lost concentration during several of the tests, most notably the Serial 7's, Plaintiff did manage to complete them all successfully. (Tr. 94, 383.)

404.1502.  Importantly, "if [one's] relationship with the source is not based on [one's] medical need

for treatment or evaluation, but solely on [one's] need to obtain a report in support of [one's] claim

for disability," that person will not be considered a treating-source.  *Id.*  In addition, the Sixth Circuit

has held that a medical source cannot be a treating source after only one visit.  *Kornecky v. Comm'r*

*Soc. Sec.*, 167 F. App'x. 496, 506-07 (6th Cir. 2006).  Indeed, the Sixth Circuit has held that often

times two or three visits are not sufficient to satisfy the treating source rule.  *Id.*  As the *Kornecky*

Court explained:

> "The treating physician doctrine is based on the assumption that a
> medical professional who has dealt with a claimant and his maladies
> over a long period of time will have a deeper insight into the medical
> condition of the claimant than will a person who has examined a
> claimant but once . . . ." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.
> 1994) . . . .
>
> [A] plethora of decisions unanimously hold that a single visit does not
> constitute an ongoing treatment relationship.  *See, e.g., White v.
> Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (occupational medicine
> specialist who evaluated claimant only once was not a treating
> physician).  Indeed, depending on the circumstances and the nature
> of the alleged condition, two or three visits often will not suffice for
> an ongoing treatment relationship. *See, e.g., Cunningham v. Shalala*,
> 880 F. Supp. 537, 551 (N.D. Ill. 1995) (where physician saw claimant
> five times in two years, it was "hardly a foregone conclusion" that his
> opinion should be afforded great weight).

*Id.*

Here, Plaintiff saw Dr. Koenig-Forbis on one occasion; he had, therefore, no ongoing

treatment relationship with her.  (Tr. 377.)  The purpose of the appointment was to obtain a medical

report for his disability claim.  (*Id.*)  Thus, Dr. Koenig-Forbis is not a treating source and her opinions

are not entitled to controlling weight.  *See* 20 C.F.R. 404.1502; *Kornecky*, 167 F. App'x at 506-07.

As such, the ALJ reasonably weighed her opinion.

19

Lastly, Plaintiff does not explain how Dr. Koenig-Forbis' findings, which are not functional limitations, demonstrate that the ALJ's RFC assessment is flawed — i.e., Plaintiff does not explain how the RFC assessment would have been altered had the ALJ credited Dr. Koenig-Forbis' findings of mood swings, anger, and depression. In short, even if the ALJ erred, Plaintiff has not shown that the error was not harmless. *See Shinseki v. Sanders*, 556 U.S. 396 (2009) (holding that (i) the Veterans Court must apply the same kind of harmless-error rule applied in civil cases when determining whether the Department of Veterans Affairs' procedural error prejudiced a veteran's disability claim and (ii) the burden is on the party attacking the Department's error to prove that the error was not harmless ); *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2010) (applying the holding in *Shinseki* to social security disability cases).

### 2. The ALJ Did Not Err by Relying on the Opinion of Dr. Kriauciunas

Plaintiff also argues that the ALJ erred by relying on the opinions of Ms. Craven and Dr. Gottlieb because they never examined Plaintiff. (Dkt. 13, Pl.'s Mot. Summ. J. at ECF Pg. ID 488.) This is incorrect. To begin with, Ms. Craven was Plaintiff's treating psychologist and Dr. Gottlieb examined Plaintiff on three occasions. (Tr. 420-32.) Moreover, the ALJ did not rely on their opinions of Ms. Craven or Dr. Gottlieb. Instead, the ALJ "assign[ed] only limited weight to Ms. Craven's opinions." (Tr. 94.) Assuming, in favor of Plaintiff, that counsel meant Dr. Kriauciunas — because he is the only non-examining physician of record — Plaintiff has failed to show that the ALJ reversibly erred.

While an ALJ generally gives "more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you," 20 C.F.R. § 404.1527(d)(1), the ALJ "must consider findings of State agency medical and psychological consultants and other program

physicians and psychologists as opinion evidence." 20 C.F.R. 404.1527(e)(2)(i).  Additionally, the regulations note that these "highly qualified physicians and psychologists . . . are experts in Social Security disability evaluation." *Id.*  When considering opinion evidence of a State Agency doctor, the ALJ evaluates the evidence based on the relevant factors described in 20 C.F.R. 404**.**1527(a)-(d), including but not limited to "any supporting evidence in the case record."  20 C.F.R. 404.1527(e)(2)(ii).

Here, the ALJ determined that Dr. Kriauciunas's report was supported by other evidence in the case record.  This included Plaintiff's longitudinal treatment record, dating back to his treatment under Dr. Herringshaw in 2003, GAF scores in the 51-60 range, a history of amenability to treatment, an ability to engage in activities of daily living, and even some consistent findings in Ms. Craven's quarterly treatment updates.  (Tr. 92-94.)  Thus, the ALJ met his obligations under the regulations and did not err in relying on Dr. Kriauciunas's opinions.[11]

**G. Conclusion**

For the reasons set forth above, This Court finds that the Administrative Law Judge's decision is supported by substantial evidence and conforms with the relevant legal standards.  Accordingly, This Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that

---

[11] Plaintiff does not argue that the ALJ violated the treating-source rule  when considering Ms. Craven's opinions.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); S.S.R. 96-2p, 1996 WL 374188 (1996). As the Seventh Circuit has noted, the Court "is not required to scour the party's various submissions to piece together appropriate arguments.  A court need not make the lawyer's case." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).  Consequently, this Court will not address the merits of this argument.  Furthermore, "any other objections to the ALJ's decision have been waived, as Plaintiff did not raise them in his motion for summary judgment." *Gray v. Comm'r of Soc. Sec.*, No. 09-11612, 2010 WL 3522283 at *9 n.2 (E.D. Mich. Aug. 2, 2010) (citing *Brainard v. Sec'y of HHS*, 889 F.2d 679, 681 (6th Cir. 1989)).

Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: June 21, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 21, 2012.

s/Jane Johnson
Deputy Clerk

22